**UNITED STATES BANKRUPTCY COURT**
**DISTRICT OF DELAWARE**

| | |
|---|---|
| In re:<br><br>**LENA BRANDS LLC** *et al.*,[1]<br><br>        Debtors. | Chapter 11<br><br>Case No. 26-10792 (TMH)<br><br>(Jointly Administered) |
| **Lena Holdings LLC, Lena Brands LLC,** and **Lena Real Estate Holdings LLC**,<br><br>        Plaintiffs,<br><br>**v.**<br><br>**Stripe, Inc., Fox Funding Group LLC, SQ Advance LLC, Libertas Funding LLC,** and **Partner Funding MD LLC d/b/a Smart Business Funder and SBF/Partners**,<br><br>        Defendants. | Adversary Case No. _____ |

**VERIFIED COMPLAINT FOR DECLARATORY JUDGMENT, TURNOVER OF ESTATE PROPERTY, VIOLATION OF AUTOMATIC STAY, AVOIDANCE OF UNPERFECTED SECURITY INTERESTS, RECHARACTERIZATION, AND SUBORDINATION**

Lena Holdings LLC, Lena Brands LLC, and Lena Real Estate Holdings LLC (collectively, the "**Debtors**"), as plaintiffs in the above-captioned adversary proceeding, by and through their undersigned counsel, file this Complaint against Stripe, Inc. ("**Stripe**"), Fox Funding Group LLC ("**Fox Funding**" or "**Fox**"), SQ Advance LLC ("**SQ Advance**"), Libertas Funding LLC ("**Libertas**"), and Partner Funding MD LLC d/b/a Smart Business Funder and SBF/Partners

---

[1]    The Debtors in these cases, along with the last four digits of their federal tax identification numbers, are: Lena Holdings LLC (6569), Lena Brands LLC (3815) and Lena Real Estate Holdings LLC (1167). Their mailing address is 13745 Omega Road, Dallas, TX 75244.

("**SBF/Partners**") (collectively, the "**Defendants**") and respectfully allege, upon knowledge, information, and belief, as follows:

## I.

## NATURE OF THE ACTION

1.      The Debtors operate eleven family-dining restaurants under the Shari's and Coco's brand names in California, Washington, and Idaho. They employ 232 people. They filed for Chapter 11 protection on May 15, 2026, because merchant cash advance lenders had bled the business of liquidity and blocked access to its own revenues. This adversary proceeding seeks to recover those revenues.

2.      The problem is concrete: on information and belief, approximately $729,726 of the Debtors' money (the "**Stripe Receivables**") sits frozen today at Stripe, the payment processor used by DoorDash and GrubHub to remit delivery order revenues to merchant accounts. Three merchant cash advance funders—Fox Funding, SQ Advance, and Libertas—and one commercial lender, SBF/Partners, delivered lien notices to Stripe between October 2025 and April 2026, each claiming a right to the Debtors' receivables. In response, Stripe froze the funds. On May 11, 2026, Stripe confirmed it will not release funds without an Inter-Creditor Agreement signed by all MCA creditors and the Debtors.

3.      Fox Funding's refusal to consent without full payment of its claims has been the central obstacle to releasing the Stripe Receivables. Prior to the commencement of the above-captioned Chapter 11 cases (the "**Chapter 11 Cases**"), Fox indicated that it would not agree to any release unless its full claimed balance—$539,120.83, including default penalties, attorneys' fees, and interest—is paid. SQ Advance and SBF/Partners likewise maintained their lien notices. The creditors' positions, which would have left the Debtors without sufficient capital to continue

operating, were untenable and ultimately forced the Debtors to commence these Chapter 11 proceedings to seek the protection of this Court.

4.      Libertas, by contrast, supports the relief sought here: it asserts first-priority status over all other MCA claimants and does not oppose turnover, provided the Stripe Receivables are treated as cash collateral subject to Libertas's senior lien and adequate protection. But Libertas's consent alone cannot unlock the Stripe Receivables—Stripe requires sign-off from all lien-notice parties. Although Fox Funding, SBF/Partners, and SQ Advance (the "**Non-Consenting MCA Parties**") have indicated some postpetition interest in discussing resolution, no consensual path exists within the timeframe the estates require.

5.      The problem is not static. Since the Petition Date, the Debtors' restaurants have continued to generate DoorDash and GrubHub delivery revenues—revenues that flow through Stripe and are immediately frozen alongside the prepetition balance. These postpetition receivables are property of the estate under § 541(a)(7), and no prepetition creditor can claim ownership of them under § 552(a). Yet Stripe continues to withhold them based on lien notices it received in the months before bankruptcy.

6.      The Debtors need two things from this Court on an expedited basis: turnover of the frozen prepetition balance and prospective injunctive relief directing Stripe to resume normal disbursements of postpetition revenues going forward. Without both forms of relief, the estate must return to this Court every week to recover newly accumulated funds—a result that serves no one. The relief is warranted on two independent grounds. Either is sufficient alone.

7.      **First, the agreements are loans—disguised or otherwise—and void ones at that.** The SBF/Partners Agreement is a loan on its face at an implied annualized rate exceeding 217%. The Fox and SQ Advance agreements require recharacterization, but each imposes fixed

payments, illusory reconciliation rights, and implied rates exceeding Florida's 25% criminal usury threshold. These are not sales of receivables. They are usurious loans, and they are void.

8.    **Second, even if the agreements are treated as true sales, the junior funders recover nothing.** Libertas perfected a blanket security interest in all of the Debtors' accounts, payment intangibles, and receivables on September 18, 2024—eight months before Fox filed and nine months before SQ Advance filed, while SBF/Partners never filed at all. Under UCC § 9-109(a)(3), even a "true sale" of accounts is a secured transaction subject to Article 9's perfection and priority rules. Under § 9-322(a)(1), priority follows the first-to-file rule. Libertas filed first. Its blanket security interest is not limited to any percentage—it covers all accounts and all receivables. And Libertas is undersecured: it holds an outstanding claim of approximately $1,668,228 against collateral worth far less. There is nothing left for the juniors to claim. Fox's and SQ Advance's "purchases" are subordinate to a senior lien that absorbs all available value, and SBF/Partners' loan—which does not even claim ownership of receivables—is both unperfected and junior. Under any theory, Fox, SQ Advance, and SBF/Partners hold no present right to the Stripe Receivables that justifies continued diversion of estate revenues.

9.    This adversary proceeding breaks the deadlock that Libertas cannot break alone. It is the mechanism by which the estate recovers cash collateral that its senior secured creditor has conditionally agreed to let the Debtors use—and the Debtors need to use to keep their restaurants open, their 232 employees paid, and their Chapter 11 Cases viable.

## II.

## JURISDICTION AND VENUE

10.    This Court has subject matter jurisdiction over this adversary proceeding under 28 U.S.C. § 1334(b), which grants district courts original jurisdiction over civil proceedings "arising

under title 11, or arising in or related to cases under title 11." The District of Delaware has referred all such proceedings to the bankruptcy court under the Amended Standing Order of Reference.

11.     This adversary proceeding is a core proceeding under 28 U.S.C. § 157(b). Each count invokes substantive rights created by the Bankruptcy Code and that could arise only in the context of a bankruptcy case. The specific core proceeding categories include: (a) turnover of property of the estate (§ 157(b)(2)(E)) (Count II); (b) determinations of the validity, extent, or priority of liens (§ 157(b)(2)(K)) (Counts I and V); (c) motions to terminate, annul, or modify the automatic stay (§ 157(b)(2)(G)) (Count III); (d) allowance or disallowance of claims against the estate (§ 157(b)(2)(B)) (Count I); (e) proceedings to avoid liens and transfers (§ 157(b)(2)(F)) (Count IV); and (f) other proceedings affecting the adjustment of the debtor-creditor relationship (§ 157(b)(2)(O)) (Counts I and V). This Court may enter final orders and judgments in this proceeding under 28 U.S.C. § 157(b)(1).

12.     The Court also has exclusive jurisdiction over property of the estate under 28 U.S.C. § 1334(e)(1), including the Stripe Receivables. This proceeding seeks to recover and protect that property.

13.     Venue is proper in this district under 28 U.S.C. § 1409(a) because this adversary proceeding is related to the Debtors' Chapter 11 Cases, Case No. 26-10792 (TMH), pending in the United States Bankruptcy Court for the District of Delaware. The Debtors are Delaware limited liability companies.

## III.

## PARTIES

14.     Plaintiffs Lena Holdings LLC, Lena Brands LLC, and Lena Real Estate Holdings LLC have their principal place of business at 13745 Omega Road, Dallas, TX 75244, and are limited liability companies currently operating under Chapter 11 of the Bankruptcy Code.

15.     Defendant Stripe is a Delaware corporation with its principal place of business at 354 Oyster Point Boulevard, South San Francisco, CA 94080. Stripe is the payment processor used by DoorDash and GrubHub to remit delivery order revenues to merchant accounts, including the accounts associated with the Debtors' restaurant locations. Stripe holds the frozen Stripe Receivables at issue in this proceeding. Stripe is named as a defendant for purposes of the turnover claim in Count II and to ensure complete relief.

16.     Defendant Fox Funding is a limited liability company organized and existing under the laws of the State of Florida, with its principal place of business at 801 S. 21st Ave, Hollywood, FL 33020.

17.     Defendant SQ Advance is a limited liability company organized and existing under the laws of the State of Florida, with its principal place of business at 7901 4th N, Suite 300, St. Petersburg FL 33702.

18.     Defendant Libertas is a limited liability company organized and existing under the laws of the State of Connecticut, with its principal place of business at 411 West Putnam Avenue, Suite 220, Greenwich, CT 06380.

19.     Defendant Partner Funding MD LLC, d/b/a Smart Business Funder and SBF/Partners, is a limited liability company organized and existing under the laws of the State of Maryland, with its principal place of business at 923 North State Street, Fairmont, MN 56031.

**IV.**

**BACKGROUND**

A.    **LIBERTAS FUNDING LLC (NOMINAL DEFENDANT)**

20.    In September 2024, Lena Holdings acquired its Shari's and Coco's restaurant operations from Gather Holdings LLC through an assignment for the benefit of creditors. As part of that acquisition, Lena Holdings assumed approximately $700,000 in outstanding obligations owed by the Gather entities to two Libertas-affiliated funds.

21.    On September 18, 2024, CT Corporation System, as Representative, filed two UCC financing statements in Delaware on behalf of Libertas to secure those assumed obligations: DE No. 20246444465 (filed at 2:42 PM) and DE No. 20246450868 (filed at 4:29 PM), attached as **Exhibits A** and **B**. The filings describe the collateral as follows: "Accounts, Payment Intangibles, Letter of Credit Rights, in each case, as defined in Article 9 of the Uniform Commercial Code, and rights to payment of any kind, including chose in action, whether any of the foregoing is owned now or acquired later; all records of any kind relating to any of the foregoing; and all proceeds relating to any of the foregoing." These are the earliest UCC filings of record against any Lena entity.

22.    On March 26, 2025, Libertas entered into an Agreement of Sale of Future Receipts with the Debtors (the "**March 2025 Agreement**"), attached as **Exhibit C**. Under the March 2025 Agreement, Libertas purchased $1,716,000 in future receipts (March 2025 Agreement, § 1.1) for a purchase price of $1,300,000 (March 2025 Agreement, § 1.2). The specified percentage was 3.90% (March 2025 Agreement, § 1.3), and the weekly delivery amount was $29,184.67.

23.    The March 2025 Agreement granted Libertas a security interest in accounts, payment intangibles, letter-of-credit rights, rights to payment, related records, and proceeds.

March 2025 Agreement, § 4.1. It prohibited the Debtors from selling Future Receipts or obtaining additional financing without Libertas's written consent. March 2025 Agreement, § 2.15.

24.     On March 28, 2025, CT Corporation System filed a UCC financing statement (DE No. 20252194113), attached as **Exhibit D**, against Lena Holdings, Lena Brands, and Lena Real Estate Holdings covering the same collateral categories.

25.     On July 29, 2025, Libertas and the Debtors entered into a new Agreement of Sale of Future Receipts (the "**Libertas Agreement**," Merchant Agreement No. 509326), attached as **Exhibit E**, which rolled up the outstanding balance under the March 2025 Agreement and certain obligations owed to WebBank. Under the Libertas Agreement, Libertas purchased $2,192,520 in future receipts (Libertas Agreement, § 1.1) for a purchase price of $1,661,000 (Libertas Agreement, § 1.2). The specified percentage is 7.75% (Libertas Agreement, § 1.3), and the weekly delivery amount is $47,457.14. Samuel Nicholas Borgese personally guaranteed the Debtors' obligations. Libertas Agreement, Guaranty § 5.1. The Libertas Agreement is governed by New York law. Libertas Agreement, § 6.5.

26.     On August 4, 2025, CT Corporation System filed a UCC financing statement (DE No. 20255667909), attached as **Exhibit F**, against Lena Holdings, Lena Brands, and Lena Real Estate Holdings covering accounts-and-receivables collateral.

27.     The Libertas Agreement grants Libertas a security interest in "all accounts, payment intangibles, letter-of-credit rights, rights to payment of any kind, and all proceeds." Libertas Agreement, § 4.1. The collateral description is not limited to any percentage of receivables or to any specified dollar amount. The Libertas Agreement provides that obtaining additional short-term financing without Libertas's written authorization constitutes an event of default. Libertas Agreement, § 3.1(e).

28.     On April 6, 2026, on information and belief, through the Law Offices of Steven Zakharyayev, Libertas delivered a lien notice with Stripe, asserting a claim of $1,668,228.50 against the Debtors' Stripe accounts. As of that date, the outstanding balance under the Libertas Agreement was approximately $1,668,228.50.

**B.     FOX FUNDING GROUP LLC**

29.     On May 20, 2025, Fox Funding entered into a Future Receivables Sale and Purchase Agreement (the "**Fox Agreement**"), attached as **Exhibit G**, with Lena Holdings LLC and entities including Lena Brands LLC and Lena Real Estate Holdings LLC. Fox Agreement, p. 1.

30.     Under the Fox Agreement, Fox purchased $909,350 in future receipts (the "**Purchased Amount**") for a purchase price of $650,000—a factor rate of 1.40. The specified percentage was 6.41% of receivables, and the daily remittance was $5,600. Fox Agreement, p. 1. After a $13,000 origination fee (Fox Agreement, Fee Schedule, p. 2), the net purchase price delivered to the Debtors was $637,000.

31.     An addendum to the Fox Agreement converted the daily remittance to a weekly remittance of $28,000, described as "a good faith approximation of five times the Daily Remittance," payable every Tuesday. Fox Agreement, Addendum.

32.     Samuel Nicholas Borgese personally guaranteed the Debtors' obligations under the Fox Agreement. His liability under the guaranty is "direct and absolute," and Fox may proceed directly against the Guarantor without first pursuing the Merchant. Fox Agreement, Guaranty, § 5.1.

33.     The Fox Agreement is governed by the laws of the State of Florida. Fox Agreement, § 6.5.

9

34.     Under § 4.1 of the Fox Agreement (Pledge of Security), Fox holds a security interest and lien in "all accounts and proceeds" of the Debtors as defined under UCC Article 9. The Fox Agreement expressly acknowledges that the sale of Future Receipts "creates a security interest as defined in the UCC," constitutes a "security agreement," and that Fox has "all the rights of a secured party." Fox Agreement, § 4.1. The Debtors are prohibited from granting any additional security interest in the collateral without Fox's written consent. Fox Agreement, § 2.15.

35.     Sections 1.4 and 1.5 of the Fox Agreement contain a reconciliation provision permitting the Debtors to request an adjustment of the Daily Remittance if actual receivables fall below the specified percentage. Section 1.4.2 requires that reconciliation requests be made by written email to reconciliation@foxbusinessfunding.com with the subject line "Request for Adjustment," accompanied by bank statements and transaction records. Reconciliation is available only if the Merchant "is not otherwise in default of this Agreement." Fox Agreement, § 1.4.2.

36.     Section 3.1 of the Fox Agreement defines Events of Default to include the following: (a) false statements or misrepresentations; (b) interference with FFG's ACH debits or prevention of FFG from collecting receivables; (c) changing bank accounts without consent; (d) certain ACH returns where Merchant "knows or has reason to know" the debit will not be honored and has not requested reconciliation under §§ 1.4–1.5; (e) obtaining additional financing without Fox's consent ("stacking"); and (f) default under any other agreement with Fox. Fox Agreement, § 3.1.

37.     Upon an Event of Default, § 3.3 of the Fox Agreement provides that Fox may "declare the full uncollected Purchased Amount plus any fees due under this Agreement (plus reasonable attorneys' fees and costs incurred in collection) due and payable immediately." Section

3.4 entitles Fox to attorneys' fees "which may include a contingency fee of up to thirty-three percent (33%) of the outstanding Purchased Amount." Fox Agreement, §§ 3.3–3.4.

38.     Section 1.9.1 of the Fox Agreement states that the Purchase Price "is not intended to be, nor shall it be construed, as a loan from FFG to Merchant" and that "[t]here is no interest rate or payment schedule in this Agreement." Fox Agreement, § 1.9.1. Section 1.9.4 provides a usury savings clause stating that if a court finds the Agreement to be a loan, "this Agreement shall be modified such that no sum charged or collected hereunder shall exceed the highest rate permissible by law of the State of Florida." Fox Agreement, § 1.9.4. Section 1.9.6 provides that Merchant "knowingly and willingly waives and is estopped from asserting any claim or defense of usury." Fox Agreement, § 1.9.6.

39.     On May 22, 2025, CT Corporation System filed a UCC financing statement (DE No. 20253681035), attached as **Exhibit H**, on behalf of Fox against Lena Holdings LLC.

40.     On October 23, 2025, through its counsel Lieberman and Klestzick, LLP, Fox delivered a lien notice with Stripe, attached as **Exhibit I**, asserting a claim of $539,120.83 against the Debtors' Stripe accounts. As of October 9, 2025, the outstanding contract balance under the Fox Agreement was approximately $405,354. The differential between the claimed amount ($539,120.83) and the contract balance ($405,354) represents attorneys' fees (up to 33% of the outstanding Purchased Amount under § 3.4), liquidated damages (§ 3.5), and default-related charges as set forth in the Fox Agreement's Fee Schedule.

C.     **SQ ADVANCE LLC**

41.     On June 24, 2025, SQ Advance entered into a Merchant Cash Advance Agreement (the "**SQ Agreement**"), attached as **Exhibit J**, with Lena Holdings LLC. SQ Agreement, p. 1.

42.     Under the SQ Agreement, SQ Advance purchased $435,000 in future receipts (SQ Agreement, § 1.1) for a purchase price of $300,000 (SQ Agreement, § 1.2)—a factor rate of 1.45. The specified percentage was 4.10% of receivables (SQ Agreement, § 1.3), and the estimated weekly payment was approximately $15,535 to $15,999. After a $12,000 origination fee, the net funds provided to the Debtors were $288,000.

43.     Samuel Nicholas Borgese personally guaranteed the Debtors' obligations under the SQ Agreement. SQ Agreement, Guaranty, § 5.1.

44.     The SQ Agreement is governed by the laws of the State of Florida. SQ Agreement, § 6.5.

45.     The SQ Agreement grants SQ Advance a security interest in all of the Debtors' accounts and proceeds as defined under UCC Article 9. The SQ Agreement expressly acknowledges that the sale of Future Receipts creates a security interest under the UCC and constitutes a "security agreement." SQ Agreement, § 4.1.

46.     The SQ Agreement contains a reconciliation provision permitting the Debtors to request an adjustment if actual receivables fall below the specified percentage. Reconciliation is available only if the merchant is not in default. SQ Agreement, § 1.4. The SQ Agreement defines Events of Default to include entering additional financing without consent, changing bank accounts, and certain ACH returns. SQ Agreement, § 3.1.

47.     Upon information and belief, SQ Advance has no independently perfected UCC financing statement filed in Delaware. A Texas filing dated June 25, 2025 (No. 25-0033184389, filed by CT Corporation System as agent), attached as **Exhibit K**, could be attributable to SQ Advance, Cromwell Capital, or Cedar Advance—all three entered MCA agreements with the Debtors around the same time and each could plausibly be behind the CT Corporation filing. The

Debtors requested confirmation from all three parties prepetition, but each declined to identify itself as the secured party behind the filing.

48. On January 8, 2026, on information and belief, through its counsel David Fogel PC, SQ Advance delivered a lien notice with Stripe, asserting a claim of $75,813.50 against the Debtors' Stripe accounts.

## D. PARTNER FUNDING MD LLC

49. SBF/Partners does business under the names "Smart Business Funder" and "SBF/Partners." Topline Recovery acts as SBF/Partners' collection agent and delivered to Stripe a lien notice on SBF/Partners' behalf.

50. On September 16, 2025, SBF/Partners entered into a Business Loan and Security Agreement (the "SBF/Partners Agreement"), attached as **Exhibit L**, with Lena Holdings LLC. SBF/Partners Agreement, p. 1. Samuel Nicholas Borgese executed the agreement on behalf of Lena Holdings as owner. The agreement was sent from contracts@smartbusinessfunder.com and signed electronically on September 16, 2025. SBF/Partners Agreement, DocuSign Certificate. Funds were disbursed on or about September 22, 2025.

51. The SBF/Partners Agreement is expressly styled as a loan—not as a purchase of future receivables. The agreement is titled "Business Loan and Security Agreement" and uses the terms "Loan," "Borrower," and "Lender" throughout. SBF/Partners Agreement, §§ 1–6. Section 6 provides: "Borrower agrees to pay Lender the Total Repayment Amount shown in the accompanying Business Loan and Security Agreement Supplement in accordance with the Payment Schedule." SBF/Partners Agreement, § 6. The agreement contains no "Specified Percentage," no "Future Receipts" definition, no characterization of the transaction as a "purchase" or "sale" of receivables, and no reconciliation provision.

52.     Under the SBF/Partners Agreement, the Amount of Loan is $100,000 and the Total Repayment Amount is $149,900. SBF/Partners Agreement, Supplement, p. 1. The Payment Schedule requires weekly payments of $12,492. SBF/Partners Agreement, Supplement, p. 1. After deduction of a $10,000 origination fee and a $50 wire fee, the Disbursement Amount—the net funds delivered to Lena Holdings—was $90,000. SBF/Partners Agreement, Supplement, p. 1.

53.     At the time the SBF/Partners Agreement was executed, the Debtors had entered into ten prior MCA agreements with nine other funders, each purporting to convey a Specified Percentage of the same pool of Future Receipts. The aggregate Specified Percentages under those ten prior agreements totaled 135.53% of the Debtors' daily receivables.

54.     The SBF/Partners Agreement grants SBF/Partners a blanket security interest in all present and after-acquired tangible and intangible personal property of Borrower and Guarantor, including but not limited to the following: (a) cash and cash equivalents; (b) inventory; (c) equipment; (d) investment property; (e) instruments and chattel paper; (f) intellectual property; (g) letter of credit rights; (h) accounts, including health-care insurance receivables; (i) deposit accounts; (j) commercial tort claims; (k) general intangibles, including payment intangibles; and (l) all accessions, products, proceeds, and collections thereof. SBF/Partners Agreement, § "Security Interest." SBF/Partners is authorized to file UCC financing statements to perfect its interest. SBF/Partners Agreement, § "Protecting the Security Interest." The SBF/Partners Agreement lists five entities—Aceneca LLC, Tabula Raza Corporation, Lena Brands LLC, Lena Holdings LLC, and Lena Real Estate Holdings LLC—in whose assets SBF/Partners claims a blanket security interest. SBF/Partners Agreement.

55.     The SBF/Partners Agreement defines Events of Default to include, among other things, the following: (a) failure to pay any Obligations when due; (b) failure to comply with any

term of the Agreement; (c) any misrepresentation; (d) occurrence of any event such that indebtedness from any other lender could be accelerated; (e) occurrence of any event that would cause another secured creditor to take priority over SBF/Partners; (f) filing of any federal or state tax lien; (g) filing of any lien or security interest against Borrower not consented to in writing by Lender; (h) commencement of any bankruptcy or insolvency proceeding; and (i) any material change in ownership or organizational structure. SBF/Partners Agreement, § "Events of Default." Upon an Event of Default, SBF/Partners may declare the entire Obligations immediately due and payable and may exercise all rights and remedies of a secured creditor under the UCC. SBF/Partners Agreement, § 30.

56.    The SBF/Partners Agreement includes a confession of judgment provision authorizing SBF/Partners to file a confession of judgment immediately upon the occurrence of any Event of Default. SBF/Partners Agreement, § 30.F. Borrower and Guarantor waived their right to service of process or notice in connection with any such judgment. SBF/Partners Agreement, § 30.F.

57.    Section 46 of the SBF/Partners Agreement contains a personal guaranty executed by Samuel Nicholas Borgese. The guaranty is "absolute, unconditional, and irrevocable," and Borgese agreed "to repay the Obligations on demand, without requiring Lender first to enforce payment or exhaust its remedies against Borrower." SBF/Partners Agreement, § 46. The agreement states: "This is a guaranty of payment and not of collection." SBF/Partners Agreement, § 46.

58.    The SBF/Partners Agreement is governed by the laws of the State of New York. SBF/Partners Agreement, § 38. Venue for any action is in the Supreme Court in the State of Maryland. SBF/Partners Agreement, § 31.

59.     Section 21 of the SBF/Partners Agreement provides that if the Loan is "subject to a law that sets maximum charges, and that law is finally interpreted so that the interest, charges or other fees collected or to be collected in connection with this Agreement exceed the permitted limits, then (i) any such charge will be reduced by the amount necessary to reduce the charge to the permitted limit and (ii) if required by applicable law, any sums already collected from Borrower that exceed the permitted limits will be refunded or credited to Borrower." SBF/Partners Agreement, § 21.

60.     The Debtors have conducted UCC searches in both Delaware and Texas. No UCC financing statement filed by or on behalf of Partner Funding MD LLC against any Lena entity has been identified in either jurisdiction. Despite the agreement's authorization to file financing statements and its listing of five Lena entities in **Exhibit L**, SBF/Partners did not perfect its security interest by filing.

61.     On October 16, 2025, through its collection agent Topline Recovery, SBF/Partners delivered a lien notice to Stripe, attached as **Exhibit M**, asserting a claim of $139,906.40 against the Debtors' Stripe accounts. As of October 9, 2025, the outstanding contract balance under the SBF/Partners Agreement was approximately $144,900.

62.     On March 9, 2026, SBF/Partners filed suit in Texas against Lena Holdings LLC, Lena Brands LLC, and Samuel Nicholas Borgese for $179,700, described as a claim for "Money Default." As of the Petition Date, that action was in the discovery phase.

63.     Postpetition, on May 28, 2026, SBF/Partners, through counsel, delivered to the Debtors a lien release notice (the "**SBF/Partners Release**"), attached as **Exhibit N**, authorizing Stripe to release the funds held in the Debtors' accounts with respect to SBF/Partners' prior lien

notice. The SBF/Partners Release states that the hold should be lifted from the Lena entities.[2] SBF/Partners remains named as a nominal defendant in this proceeding because Stripe's policy requires unanimous consent or a court order to release funds, and the Court needs jurisdiction over all lien holders to enter a binding turnover order.

**E.    THE ADDITIONAL MCA FUNDERS AND AGGREGATE SPECIFIED PERCENTAGES**

64.    In addition to the four MCA funders described in Sections A through D above, the Debtors entered into merchant cash advance agreements with seven additional funders between June 2025 and September 2025 (together with Libertas, Fox, SQ Advance, and SBF/Partners, the "MCA Funders"). As of the Petition Date, the Debtors' aggregate outstanding obligations to all eleven MCA Funders exceeded $5.1 million.

*(1)    Cedar Advance LLC*

65.    Cedar Advance LLC ("Cedar") is a Florida limited liability company with a principal address at 5401 Collins Avenue CU-9A, Miami Beach, FL 33140. On or about June 12, 2025, Cedar entered into a Standard Merchant Cash Advance Agreement (the "Cedar Agreement"), with a Lena entity. Cedar Agreement, p. 1. Under the Cedar Agreement, the Purchase Price was approximately $485,000, the Receivables Purchased Amount was approximately $680,000, and the Specified Percentage was 7%. Cedar Agreement, p. 1. The initial estimated weekly payment was $22,667.

---

[2]    Although the release itself indicates that SBF/Partners "authorizes Stripe, Inc. to release any and all funds and/or accounts currently held in reserve and/or restrained per the Notification to Lena Holdings LLC, Aceneca LLC, Tabula Raza Corporation, Lena Brands LLC, Lena Real Estate Holdings LLC, Samuel Nicholas Borgese, and/or its/their principals, agents, heirs and assigns," SBF/Partners' accompanying email indicates that the notice should remain in place as to two non-debtor entities, Aceneca LLC and Tabula Raza Corporation. Those entities are owed by Borgese but are unrelated to Lena. It is the Debtors' understanding that these two entities are restaurant concepts holding intellectual property for possible future development with no current operations. With no revenues or receivables, there would be no possibility of comingling of funds as between the Debtors and Aceneca LLC and Tabula Raza Corporation. All funds at Stripe consist exclusively of the Debtors' receivables, and the Debtors take no position as to the propriety of any liens against the two non-debtors.

66.     Under the Cedar Agreement, Cedar "purchases" all of the Merchant's future accounts, contract rights, and other obligations arising from or relating to customer payments (the "Receivables"), defined as "all payments made by cash, check, credit or debit card, electronic transfer, or other form of monetary payment in the ordinary course of each merchant's business." Cedar Agreement, § 1. The Cedar Agreement describes the transaction as a sale conveying ownership of the Receivables to Cedar. Cedar Agreement, § 14.

67.     The Cedar Agreement grants Cedar a security interest in all of the Merchant's accounts, including deposit accounts, accounts-receivable, and other receivables, and all proceeds as defined by Article 9 of the UCC. Cedar Agreement, § 18. Cedar is authorized to file UCC-1 financing statements. Cedar Agreement, § 18. The Cedar Agreement contains a reconciliation provision permitting the Merchant to request an adjustment at any time; Cedar pauses ACH during reconciliation. Cedar Agreement, § 4. Events of Default include materially false representations, blocking Cedar's ACH debits, preventing Cedar's collection of receivables, and certain ACH returns. Cedar Agreement, § 30.

68.     The Cedar Agreement is governed by the laws of the State of Florida. Cedar Agreement, § 33. Samuel Nicholas Borgese personally guaranteed the Debtors' obligations under the Cedar Agreement. Cedar Agreement, Guaranty.

69.     The Debtors have not identified any UCC financing statement filed by or on behalf of Cedar Advance LLC against any Lena entity in Delaware or Texas.

### (2)     Cromwell Capital LLC

70.     Cromwell Capital LLC ("Cromwell") is a Florida limited liability company with a principal address at 398 E Dania Beach Blvd #297, Dania Beach, FL 33004.

71.     On June 16, 2025, Cromwell entered into a Future Receivables Purchase and Sale Agreement (the "**Cromwell Agreement**"), with Lena Brands LLC and other entities. Cromwell Agreement, p. 1.

72.     Under the Cromwell Agreement, Cromwell purchased $429,000 in future receivables (the "**Purchased Amount**") for a purchase price of $300,000. Cromwell Agreement, p. 1. The Specified Percentage was 8% of receivables, and the weekly remittance amount was $15,321.43. Cromwell Agreement, p. 1. After closing costs, including a $6,000 underwriting fee, a $6,000 origination fee, and a $79 UCC fee, the net amount funded to the Debtors was $287,921. Cromwell Agreement, p. 1.

73.     The Cromwell Agreement provides that the Seller "sells, assigns, transfers and conveys" to Cromwell "all of Seller's right, title and interest in and to the Specified Percentage of the Future Receivables," and that the Seller "transfers to Purchaser full and complete ownership of the Purchased Future Receivables and Seller retains no legal or equitable interest therein." Cromwell Agreement, § 3.

74.     The Cromwell Agreement grants Cromwell a security interest in all of the Seller's accounts, deposit accounts, accounts-receivable, and other receivables, and all proceeds. Cromwell Agreement, § 15. Cromwell is authorized to file UCC-1 financing statements and may require account control agreements. Cromwell Agreement, § 15. Events of Default include interfering with ACH collection, using multiple depository accounts, changing bank accounts, multiple NSF returns, and entering additional financing without consent. Cromwell Agreement, § 11.

75.     The Cromwell Agreement is governed by the laws of the State of Florida. Cromwell Agreement, § 22. Samuel Nicholas Borgese personally guaranteed the Debtors' obligations. Cromwell Agreement, Guaranty.

76.     A Texas UCC filing dated June 25, 2025 (No. 25-0033184389, filed by CT Corporation System as agent), **Exhibit K**, is date-compatible with the Cromwell Agreement but has not been confirmed as attributable to Cromwell. That filing is also date-compatible with the SQ Agreement (June 24, 2025). The Debtors requested confirmation from Cromwell prepetition, but Cromwell did not identify itself as the secured party behind the filing.

*(3)     G&G Funding Group LLC*

77.     G&G Funding Group LLC ("**G&G**") is a limited liability company with a principal address at 57 West 57th Street, 4th Floor, New York, NY 10019.

78.     On July 15, 2025, G&G entered into a Future Receivables Sale and Purchase Agreement (the "**G&G Agreement**"), with Lena Brands LLC. G&G Agreement, p. 1.

79.     Under the G&G Agreement, G&G purchased $6,061,684.19 in future receivables (the "**Purchased Amount**") for a purchase price of $4,068,244.42. G&G Agreement, p. 1. The Specified Percentage was 33% of all future receipts, and the initial daily installment was $22,648.33. G&G Agreement, p. 1. The G&G Agreement is the single largest MCA obligation in the Debtors' portfolio.

80.     The G&G Agreement was structured as a scheduled purchase, with the Purchase Price disbursed in weekly increments over a 50-week period pursuant to a purchase schedule set forth in an addendum. G&G Agreement, Addendum. G&G reserved the right to terminate its obligation to make weekly purchases at its option at any time after an Event of Default or breach. G&G Agreement, Addendum. If G&G terminated its purchase obligation, the Seller nevertheless remained obligated to remit the full Purchased Amount including all fees. G&G Agreement, Addendum. Upon information and belief, based on the Debtors' records, G&G had funded approximately $1,571,294.67 in net amounts to the Debtors as of October 9, 2025.

81.     The G&G Agreement grants G&G a security interest in all present and future accounts, receivables, deposit accounts, and proceeds. G&G Agreement, § 11. G&G is authorized to file UCC-1 financing statements. G&G Agreement, § 11. The G&G Agreement also includes a confession of judgment provision. G&G Agreement, § 13. Events of Default include entering into additional financing without consent, changing bank accounts, and certain ACH returns. G&G Agreement, § 9.

82.     The G&G Agreement is governed by the laws of the State of Illinois. G&G Agreement, § 22. Samuel Nicholas Borgese personally guaranteed the Debtors' obligations. G&G Agreement, Guaranty.

83.     The Debtors have not identified any UCC financing statement filed by or on behalf of G&G Funding Group LLC against any Lena entity in Delaware or Texas.

### *(4)     Thoro Corp*

84.     Thoro Corp ("**Thoro**") is a corporation with a principal address at 525 W 52nd Street, Apt 9 CS, New York, NY 10019.

85.     On July 30, 2025, Thoro entered into a Standard Merchant Cash Advance Agreement (the "**Thoro Agreement**"), with Lena Brands LLC and Lena Holdings LLC. Thoro Agreement, p. 1.

86.     Under the Thoro Agreement, Thoro purchased $375,000 in future receivables (the "**Receivables Purchased Amount**") for a purchase price of $250,000. Thoro Agreement, p. 1. The Specified Percentage was 20% of receivables, and the initial estimated weekly payment was $15,000. Thoro Agreement, p. 1. After a $25,000 origination fee, the net funds provided to the Debtors were $225,000. Thoro Agreement, p. 1.

21

87.      The Thoro Agreement provides that the Merchant sells, assigns, and transfers to Thoro all of the Merchant's future accounts, contract rights, and other obligations arising from customer payments, and that the Merchant holds such Receivables "in trust for THORO." Thoro Agreement, § 1. The Thoro Agreement grants Thoro a security interest in all accounts, including deposit accounts, accounts-receivable, and other receivables, and all proceeds. Thoro Agreement, § 18. Events of Default include entering additional financing without consent, changing bank accounts, and certain ACH returns. Thoro Agreement, § 30.

88.      The Thoro Agreement is governed by the laws of the State of Florida. Thoro Agreement, § 33. Samuel Nicholas Borgese personally guaranteed the Debtors' obligations. Thoro Agreement, Guaranty.

89.      On July 31, 2025, Thoro filed a UCC financing statement in Texas (No. 25-0047804404) against Lena Brands LLC and Lena Holdings LLC. The filing covers "all accounts, including without limitation, all deposit accounts, accounts-receivable, and other receivables" and all proceeds.

### (5)      *Green Note Capital Partners SPV LLC*

90.      Green Note Capital Partners SPV LLC ("**Green Note**") is a limited liability company with a principal address at 1019 Ave P Suite 401, Brooklyn, NY 11223.

91.      On August 11, 2025, Green Note entered into a Standard Merchant Cash Advance Agreement (the "**Green Note Agreement**") with Lena Holdings LLC. Green Note Agreement, p. 1.

92.      Under the Green Note Agreement, Green Note purchased $448,000 in future receivables (the "**Receivables Purchased Amount**") for a purchase price of $320,000. Green Note Agreement, p. 1. The Specified Percentage was 4.48% of receivables, and the initial estimated

weekly payment was $22,400. Green Note Agreement, p. 1. After a $19,200 origination fee, the net funds provided to the Debtors were $300,800. Green Note Agreement, p. 1.

93. The Green Note Agreement provides that the Merchant sells, assigns, and transfers to Green Note all of the Merchant's future accounts, contract rights, and other obligations arising from customer payments, with the Merchant holding such Receivables "in trust for GNC." Green Note Agreement, § 1. The Green Note Agreement grants Green Note a security interest in all accounts, including deposit accounts, accounts-receivable, and other receivables, and all proceeds. Green Note Agreement, § 18. Events of Default include entering additional financing without consent, changing bank accounts, and certain ACH returns. Green Note Agreement, § 30.

94. The Green Note Agreement is governed by the laws of the State of New York. Green Note Agreement, § 33. Samuel Nicholas Borgese personally guaranteed the Debtors' obligations. Green Note Agreement, Guaranty.

95. On September 30, 2025, Green Note filed a UCC financing statement in Texas (No. 25-0057045682), against Lena Holdings LLC, Lena Brands LLC, and Tabula Raza Corporation. The filing covers "all personal property of every kind and nature," including accounts, contract rights, deposit accounts, instruments, and all proceeds.

### (6) Riverside Capital NY

96. Upon information and belief, Riverside Capital NY ("Riverside") is a merchant cash advance funder that does business under that name, with a Connecticut nexus based on its enforcement provisions. The Debtors have been unable to confirm Riverside's full legal name, state of formation, or principal address from available records.

97.     On August 27, 2025, Riverside entered into a Purchase and Sale of Future Receivables Agreement (the "**Riverside Agreement**") with Lena Brands LLC and Lena Brands TX LLC. Riverside Agreement, p. 1.

98.     Under the Riverside Agreement, Riverside purchased $375,000 in future receivables (the "Purchased Amount") for a purchase price of approximately $250,000. Riverside Agreement, p. 1. The Specified Percentage was 35% of Future Receipts, and the daily remittance was $12,500. Riverside Agreement, p. 1.

99.     The Riverside Agreement provides that the Merchant sells 35% of "all future receipts," defined as "all payments made by cash, check, electronic transfer or other form of monetary payment deposited into Merchants Bank Account" arising from the merchant's sale of goods and/or services. Riverside Agreement, § 1. The Riverside Agreement grants Riverside a security interest in all present and future accounts, chattel paper, documents, equipment, general intangibles, instruments, inventory, funds in merchant's bank accounts, electronic check transactions, and proceeds. Riverside Agreement, § 4. Events of Default include entering any financing agreement with another party, using multiple depository accounts, and NSF returns. Riverside Agreement, § 3.

100.    Upon information and belief, the Riverside Agreement is governed by Connecticut law, with enforcement provisions referencing Connecticut courts and prejudgment remedy waivers under Connecticut law. Riverside Agreement, §§ 6–7. Samuel Nicholas Borgese personally guaranteed the Debtors' obligations. Riverside Agreement, Guaranty. The Riverside Agreement provides that the guaranty is "limited and non-recourse" if the Merchant ceases operations or goes out of business. Riverside Agreement, Guaranty.

101.   The Debtors have not identified any UCC financing statement filed by or on behalf of Riverside Capital NY against any Lena entity in Delaware or Texas.

*(7)     Immediate Capital Solutions LLC (d/b/a Immediate Advances)*

102.   Immediate Capital Solutions LLC, doing business as Immediate Advances ("**Immediate**"), is a Delaware limited liability company with a principal address at 19790 W Dixie Highway, 11th Floor, Unit 1119, Miami, FL 33180.

103.   On September 11, 2025, Immediate entered into an Agreement of Sale of Future Receipts (the "**Immediate Agreement — Contract 1**") with Lena Brands LLC. Immediate Agreement — Contract 1, p. 1. Under this agreement, Immediate purchased $314,000 in future receipts (the "**Sold Amount of Future Receipts**") for a purchase price of $200,000. Immediate Agreement — Contract 1, p. 1. The Specified Percentage was 4.77% of the Seller's future receipts. Immediate Agreement — Contract 1, § 1. After a $12,000 origination fee, the net funds provided to the Debtors were $188,000. Immediate Agreement — Contract 1, p. 1.

104.   On September 12, 2025, Immediate entered into a second Agreement of Sale of Future Receipts (the "**Immediate Agreement — Contract 2**"), with Lena Brands LLC. Immediate Agreement — Contract 2, p. 1. Upon information and belief, the Specified Percentage under Contract 2 was 5.02% of the Seller's future receipts. The remaining terms of Contract 2 are substantially similar to Contract 1.

105.   Each Immediate Agreement provides that the Seller sells all of the Seller's "right, title, and interest in the Specified Percentage of Future Receipts" and that this transfer constitutes "a sale that conveyed full and complete ownership of the Sold Future Receipts to Purchaser, with Seller retaining no legal or equitable interest therein." Immediate Agreement — Contract 1, § 1. Each Immediate Agreement grants Immediate a security interest in all present and future accounts,

receivables, deposit accounts, and proceeds. Immediate Agreement — Contract 1, § 16. Events of Default include entering additional financing without consent, changing bank accounts, and certain ACH returns. Immediate Agreement — Contract 1, § 13.

106. Each Immediate Agreement is governed by the laws of the State of New York. Immediate Agreement — Contract 1, § 23. Samuel Nicholas Borgese personally guaranteed the Debtors' obligations under each agreement. Immediate Agreement — Contract 1, Guaranty.

107. On September 30, 2025, Immediate filed a UCC financing statement in Texas (No. 25-0057052613), against Lena Brands LLC. The filing contains negative pledge and anti-stacking provisions.

**(8)     *Aggregate Specified Percentages***

108. The Specified Percentages set forth in the MCA agreements for which the Debtors have obtained executed copies are as follows:

| Funder | Specified Percentage | Agreement Date |
|---|---|---|
| Riverside Capital | 35% | August 27, 2025 |
| G&G Funding | 33% | July 15, 2025 |
| Thoro Corp | 20% | July 30, 2025 |
| Cromwell Capital | 8% | June 16, 2025 |
| Libertas | 7.75% | July 29, 2025 |
| Fox Funding | 6.41% | May 20, 2025 |
| Immediate Advances (Contract 2) | 5.02% | September 12, 2025 |
| Immediate Advances (Contract 1) | 4.77% | September 11, 2025 |
| Green Note Capital | 4.48% | August 11, 2025 |
| SQ Advance | 4.10% | June 24, 2025 |
| Cedar Advance | 7% | June 12, 2025 |
| SBF/Partners | [Loan — no Specified Percentage] | September 16, 2025 |
| **Known Total (excl. SBF)** | **135.53%** | |

The sum of the Specified Percentages set forth in the eleven MCA agreements for which executed copies are available is 135.53%.

109. With the exception of Libertas, each MCA agreement was entered into during a period in which one or more prior MCA agreements, each purporting to convey a Specified Percentage of the same pool of Future Receipts, were already outstanding. Each funder's Specified Percentage was calculated against the same gross revenue base and drawn from the same bank accounts via ACH debit.

110. At the time each MCA agreement other than the Libertas Agreement was executed, one or more UCC financing statements filed by prior MCA Funders against Lena entities were

27

publicly recorded in Delaware or Texas. Each MCA agreement prohibits the Debtors from entering into additional financing without the funder's written consent. *See, e.g.,* Fox Agreement, § 3.1(e); SQ Agreement, § 3.1; Thoro Agreement, § 30; Cromwell Agreement, § 11; G&G Agreement, § 9; Green Note Agreement, § 30; Riverside Agreement, § 3; Immediate Agreement — Contract 1, § 13; Libertas Agreement, § 3.1(e).

### F.  THE LIEN NOTICES AND FROZEN FUNDS

111.  Stripe is the payment processor used by DoorDash and GrubHub to remit delivery order revenues to merchant accounts. The Debtors' eleven restaurant locations maintain Stripe Connected Accounts through which DoorDash and GrubHub delivery revenues are received. Stripe holds the resulting funds in these accounts on the Debtors' behalf. DoorDash Liens Report— Lena Holdings LLC (April 17, 2026) (the "**DoorDash Liens Report**"), attached as **Exhibit O**.

112.  Each lien notice was sent by or on behalf of the respective funder—through counsel or a collection agent—directly to Stripe, directing Stripe to withhold funds in the Debtors' accounts. Upon on information and belief, none of them filed a UCC financing statement naming Stripe as debtor in connection with these notices.

113.  Between approximately September 15 and October 15, 2025, the Debtors stopped or blocked ACH payments to all MCA funders except Libertas. This nonpayment constituted an Event of Default under each of the affected MCA agreements, triggering each funder's right to accelerate the full Purchased Amount and exercise remedies under UCC Article 9, including notification of account debtors. The lien notices delivered to Stripe in October 2025 followed shortly thereafter.

114.  Between October 16, 2025, and April 6, 2026, four parties sent lien notices directly to Stripe asserting claims against the funds held in the Debtors' Stripe accounts:

| Date Filed | Party | Counsel/Agent | Amount Claimed |
|---|---|---|---|
| October 16, 2025 | SBF/Partners | Topline Recovery | $139,906.40 *(withdrawn)* |
| October 23, 2025 | Fox Funding | Lieberman and Klestzick, LLP | $539,120.83 |
| January 8, 2026 | SQ Advance | David Fogel PC | $75,813.50 |
| April 6, 2026 | Libertas | Law Offices of Steven Zakharyayev | $1,668,228.50 |
| **Total Claimed** | | | **$2,423,069.23** |

115. Each lien notice applies uniformly across all of the Debtors' Stripe accounts. The DoorDash Liens Report reflects the same four lien notices duplicated across each account. No lien notice is limited to a discrete subset of the Stripe Receivables or a specific restaurant location. Each of the parties assert claims against the same undivided pool of Stripe Receivables. DoorDash Liens Report.

116. The Fox Agreement authorizes Fox to "notify any Account Debtor or any third party holding or possessing your accounts . . . directing such Account Debtor or third party to hold all of the Receivables until all obligations under this Agreement have been satisfied." Fox Agreement, § 4.1. The SQ Agreement contains a substantially identical provision. SQ Agreement, § 4.1. The SBF/Partners Agreement grants SBF/Partners authority to "exercise all rights and remedies of a secured creditor under the UCC" upon default, which includes notification rights under UCC § 9-607. SBF/Partners Agreement, § 30. The Libertas Agreement authorizes Libertas to instruct any "Receipts Custodian"—defined to include any third party holding or possessing Future Receipts—to deliver all Future Receipts directly to Libertas. Libertas Agreement, § 8.

117.    The aggregate amount claimed by the four parties ($2,423,069.23) exceeds the Stripe Receivables as of April 17, 2026 (approximately $420,000) by more than five to one. DoorDash Liens Report; Email from Samuel Borgese to counsel dated April 17, 2026 ("Total funds on lien hold are in excess of $420K").

118.    Upon receipt of the lien notices, Stripe froze all funds in the Debtors' accounts. On May 11, 2026, a DoorDash representative confirmed Stripe's release policy in writing: "I've been informed that due to multiple active legal holds, the required document is an Inter-Creditor Agreement, which the Creditor must provide directly and the Debtor must sign." Email from Tee Bryant (DoorDash Merchant Success Manager) to Samuel Borgese dated May 11, 2026 (the "**May 11 Email**"), attached as **Exhibit P**. This policy requires unanimous creditor consent before any release—an impossibility given the Debtors' critical need to access the Stripe Receivables, Libertas's senior interest in those receivables, and Fox's ultimate insistence on full payment of its disputed claims before releasing its lien notice, notwithstanding Fox's lack of any legal or economic interest in the Stripe Receivables.

119.    Upon information and belief, Stripe's internal policy treats each lien notice as an independent hold on the Debtors' accounts. Fox's lien notice alone is sufficient to prevent any release. The additional lien notice from SQ Advance independently prevents release as well. Although SBF/Partners withdrew its lien notice postpetition as set forth in Section IV.D above, Stripe has indicated that it requires consent or withdrawal from all lien-notice parties, and no funds will be released without resolution of all outstanding lien notices—whether by consent, withdrawal, or court order.

120.    The frozen Stripe balance increased over time as the Debtors' restaurants continued to generate DoorDash and GrubHub delivery revenues that flowed into the frozen accounts. As of

December 5, 2025—approximately seven weeks after the first lien notices were delivered to Stripe—the balance frozen at Stripe was approximately $112,000. Email from Deven Khosla to Samuel Borgese dated December 5, 2025 ("$112K is held at Stripe"). By April 17, 2026, the frozen balance had grown to approximately $420,000. DoorDash Liens Report; Borgese Email of April 17, 2026. October 2, 2025 was the date of the last payout received from DoorDash and GrubHub. The Debtors' books and records indicate that, by the Petition Date (May 15, 2026), the frozen prepetition balance had grown to approximately $692,537, representing $639,365 in DoorDash activity and $53,172 in GrubHub activity from October 2, 2025 through May 15, 2026.

121.    Between October 2025 and the Petition Date, the Debtors and their representatives made multiple attempts to negotiate a release of the Stripe Receivables. In December 2025, Fox and SBF/Partners communicated through Deven Khosla (a consultant working with the Debtors on MCA negotiations) that they were "willing to split the funds 50/50"—referring to the approximately $112,000 then frozen at Stripe. Email from Deven Khosla to Samuel Borgese dated December 5, 2025. That arrangement was not consummated. Fox's counsel, Lieberman and Klestzick, communicated to Borgese that Fox would discuss a payment plan but required weekly (not monthly) payments. Email from Deven Khosla to Samuel Borgese dated December 5, 2025.

122.    Khosla communicated to Borgese that "we cannot get funds released from Square without a sign off from Lieberman/Fox." Email from Deven Khosla to Samuel Borgese, April 17, 2026. Fox, through its counsel Lieberman and Klestzick, stated that it would not consent to any release unless its full claimed balance was paid. Fox's outstanding contract balance as of October 9, 2025 was approximately $405,354; Fox's claimed amount of $539,120.83 includes attorneys' fees of up to 33% of the outstanding Purchased Amount (Fox Agreement, § 3.4), liquidated damages (Fox Agreement, § 3.5), and default-related charges. Fox's refusal to consent was the

dispositive barrier to a prepetition release of the Stripe Receivables. The Debtors separately did not obtain consent from SQ Advance or SBF/Partners, whose outstanding lien notices remained on file with Stripe.

123.    Separately, Libertas negotiated with DoorDash to recover funds subject to Libertas's lien, with Libertas agreeing to release 50% of recovered lien funds to the Debtors and credit the remaining 50% to the Debtors' outstanding Libertas balance. That arrangement applied to Libertas's own lien notice but did not resolve the lien notices sent to Stripe by Fox, SQ Advance, or SBF/Partners, which remained in place and continued to prevent Stripe from releasing funds.

124.    The Debtors' inability to obtain a consensual release of the Stripe Receivables—notwithstanding months of negotiation and Libertas's willingness to cooperate—was a principal factor in the Debtors' decision to commence these Chapter 11 Cases. Absent judicial intervention, the funds would have remained indefinitely frozen.

125.    Since the Petition Date, the Debtors' restaurants have continued to operate and to generate DoorDash and GrubHub delivery revenues. These revenues are processed through Stripe. Upon information and belief, Stripe continues to withhold all incoming funds based on the prepetition lien notices. New postpetition funds flow into the Debtors' Stripe accounts daily and are frozen alongside the prepetition balance.

126.    Based on the Debtors' current delivery revenue volume, the frozen balance at Stripe is increasing at a rate of approximately $23,171 per week (approximately $92,684 per month), based on the trailing three-week average receivable balance. As of May 25, 2026, the Debtors' books and records indicate that the combined prepetition and postpetition balance frozen at Stripe is approximately $729,726, consisting of $692,537 in prepetition receivables and $37,189 in

32

postpetition receivables ($35,120 in DoorDash activity and $2,069 in GrubHub activity from May 16 through May 25, 2026).

127.    SBF/Partners has withdrawn its lien notice postpetition, as set forth in Section IV.D above. Fox Funding and SQ Advance have not withdrawn or modified their lien notices since the Petition Date. As of the date of this Complaint, Stripe continues to withhold all funds—both prepetition and postpetition—based on the remaining lien notices sent to Stripe by Fox and SQ Advance.

## V.

## CLAIMS FOR RELIEF

## COUNT I

**(Declaratory Judgment — Recharacterization as Usurious Loans and Voidness — Against Fox Funding Group LLC, SQ Advance LLC, and Partner Funding MD LLC)**

128.    Plaintiffs repeat, reallege, and incorporate by reference herein the allegations contained in paragraphs 1 through 127 of the Complaint as though fully set forth in this Count I.

129.    This is a claim for declaratory relief brought under 28 U.S.C. §§ 2201 and 2202 and Federal Rules of Bankruptcy Procedure 7001(2) and (9).

130.    An actual controversy exists between Plaintiffs and each of the Defendants concerning the legal characterization of the agreements described in Sections IV.B, IV.C, and IV.D above. Fox Funding and SQ Advance each assert that its agreement constitutes a "true sale" of future receivables, entitling it to ownership of a specified percentage of the Debtors' revenues processed through Stripe. SBF/Partners asserts a secured loan claim. The Debtors contend that all

three agreements are loans—disguised or otherwise—and that all three are void as criminally usurious. Approximately $729,726 in estate property remains frozen at Stripe because of the Defendants' lien notices, and the Debtors cannot recover those funds without a judicial determination of the parties' respective rights.

131.    The SBF/Partners Agreement requires no recharacterization. The agreement is titled "Business Loan and Security Agreement" and uses the terms "Loan," "Borrower," and "Lender" throughout. SBF/Partners Agreement, §§ 1–6. It contains no "purchase" language, no "Specified Percentage," no "Future Receipts" definition, and no reconciliation provision. As set forth above, it is a loan by its own terms.

132.    The SBF/Partners Agreement selects New York law. SBF/Partners Agreement, § 38. Under New York Penal Law § 190.40, criminal usury in the second degree occurs when a person knowingly charges interest on a loan at a rate exceeding 25% per annum. The criminal usury defense is preserved for all borrowers, including corporations. N.Y. Gen. Oblig. Law § 5-521(3).

133.    The implied annualized interest rate under the SBF/Partners Agreement exceeds 217%. The Amount of Loan is $100,000, the Total Repayment Amount is $149,900, and the Payment Schedule requires weekly payments of $12,492. The spread is $49,900. At $12,492 per week, the Total Repayment Amount is repaid in approximately 12 weeks—roughly 84 days. The implied annualized rate is ($49,900 ÷ $100,000) ÷ (84 ÷ 365) = 216.9%. That rate exceeds the 25% criminal usury threshold by a factor of more than eight.

134.    A criminally usurious loan is void *ab initio* under New York law—the lender forfeits both principal and interest. *Adar Bays, LLC v. GeneSYS ID, Inc.*, 37 N.Y.3d 320, 326 (2021); N.Y. Gen. Oblig. Law § 5-511. Associated guarantees and collateral agreements are

34

likewise unenforceable. *Blue Wolf Capital Fund II, L.P. v. Am. Stevedoring Inc.*, 105 A.D.3d 178, 183 (1st Dep't 2013). Because the SBF/Partners Agreement is a loan on its face at an annualized rate exceeding 217%, it is void as a criminally usurious loan under New York Penal Law § 190.40 and N.Y. Gen. Oblig. Law § 5-511. SBF/Partners holds no enforceable claim against the Debtors and no ownership or security interest in the Stripe Receivables. SBF/Partners' postpetition withdrawal of its lien notice confirms that even a party holding an express loan agreement and blanket security interest recognized it had no enforceable claim to the Stripe Receivables—a concession that underscores the invalidity of the remaining defendants' positions.

135.    The Fox Agreement and the SQ Agreement are styled as sales of future receivables. Fox Agreement, § 1.9.1; SQ Agreement, § 1. Each agreement, however, is in substance a loan. The Third Circuit's holistic recharacterization inquiry governs this determination. Under *Cohen v. KB Mezzanine Fund II, LP (In re SubMicron Systems Corp.)*, 432 F.3d 448, 457 (3d Cir. 2006), the Court examines "what the parties truly intended, inferred from the contracts, the parties' conduct, and the economic reality of the transaction." The "hallmark of a loan" is that the lender "is absolutely entitled to repayment under all circumstances." *Id.* at 458.

136.    As set forth above, the Fox Agreement establishes a fixed weekly remittance of $28,000, and the SQ Agreement establishes a fixed estimated weekly payment of approximately $15,535 to $15,999. These amounts do not automatically fluctuate with actual receivables. The "Specified Percentage" recited in each agreement is used only to calibrate a fixed dollar amount debited by ACH regardless of the Debtors' actual revenues. A fixed repayment obligation is the hallmark of a loan, not a contingent purchase of receivables. *Davis v. Richmond Capital Group, LLC*, 194 A.D.3d 516, 517 (1st Dep't 2021).

137.    Each agreement contains a reconciliation provision permitting the Debtors to request an adjustment of the fixed payment amount if actual receivables fall below the Specified Percentage. Fox Agreement, §§ 1.4–1.5; SQ Agreement, § 1.4. Reconciliation is available only if the merchant "is not otherwise in default of this Agreement." Fox Agreement, § 1.4.2; SQ Agreement, § 1.4. As set forth above, the Events of Default in each agreement include entering additional financing without consent, changing bank accounts, and returning as few as two ACH debits — events unrelated to revenue performance that occurred in the ordinary course of the Debtors' distressed business. A reconciliation right conditioned on the absence of default — under contracts that treat routine business decisions as defaults — does not make the payment obligation variable. *Davis*, 194 A.D.3d at 517 ("the discretionary nature of the reconciliation provisions" supported loan characterization).

138.    As set forth above, Samuel Nicholas Borgese personally guaranteed the Debtors' obligations under each agreement. His liability is "direct and absolute," enforceable without first pursuing the merchant entities. Fox Agreement, Guaranty, § 5.1; SQ Agreement, Guaranty, § 5.1. A funder that can collect on a personal guarantee upon the merchant's bankruptcy does not bear the risk of the merchant's business failure. *Principis Capital, LLC v. I Do, Inc.*, 201 A.D.3d 752, 753 (2d Dep't 2022); *Davis*, 194 A.D.3d at 517.

139.    As set forth above, each agreement grants the funder a security interest in all of the Debtors' accounts, receivables, and proceeds—collateral far broader than the "purchased" receivables. Fox Agreement, § 4.1; SQ Agreement, § 4.1. A true purchaser of a defined percentage of future receivables has no need for a blanket lien on all of the seller's assets. The breadth of the security interest is consistent with a loan secured by a general assignment, not a sale of a discrete asset.

140.    The full Purchased Amount accelerates upon Events of Default unrelated to revenue performance—including entering additional financing, changing bank accounts, and multiple ACH returns. Fox Agreement, §§ 3.1, 3.3; SQ Agreement, § 3.1. These triggers bear no relation to the Debtors' ability to generate revenue. The acceleration provisions ensure that the full Purchased Amount becomes due before any revenue shortfall occurs, eliminating any meaningful risk that the funder's recovery depends on business performance.

141.    Despite language suggesting an indefinite duration, each agreement's fixed payment schedule produces a calculable payoff date. Fox's $28,000 weekly remittance against a $909,350 Purchased Amount yields a term of approximately 32.5 weeks. SQ Advance's approximately $15,535 weekly payment against a $435,000 Purchased Amount yields a term of approximately 28 weeks. A transaction with a calculable payoff date and no genuine contingency based on revenue performance has a finite term. *Principis Capital*, 201 A.D.3d at 753.

142.    Considered in their totality, the Fox and SQ Advance agreements impose fixed payment obligations, condition the sole mechanism for payment adjustment on the absence of broadly defined defaults, grant security interests extending far beyond the "purchased" receivables, accelerate the full Purchased Amount upon non-revenue events, produce calculable payoff dates, and ensure recourse through personal guarantees enforceable upon bankruptcy. Under the *SubMicron* holistic inquiry and the analytical framework of *Davis* and *Principis Capital*, these agreements are loans, not sales of receivables.

143.    The Fox Agreement selects Florida law. Fox Agreement, § 6.5. The SQ Agreement also selects Florida law. SQ Agreement, § 6.5. Once the Court determines these agreements are loans, the consequences of that determination—including whether the loans are usurious—are governed by Florida law. *See In re SubMicron*, 432 F.3d at 459. Florida courts look to "the

37

substance of the transaction rather than to the form to determine usury." *Pinchuck v. Canzoneri*, 920 So. 2d 713, 716 (Fla. Dist. Ct. App. 2006).

144. The implied annualized interest rate under the Fox Agreement exceeds 60%. The Purchase Price is $650,000, the Purchased Amount is $909,350, and the weekly remittance is $28,000. The spread is $259,350. At $28,000 per week, the Purchased Amount is repaid in approximately 32.5 weeks—about 228 days. The implied annualized rate is ($259,350 ÷ $650,000) ÷ (228 ÷ 365) = 63.9%.

145. The implied annualized interest rate under the SQ Agreement exceeds 80%. The Purchase Price is $300,000, the Purchased Amount is $435,000, and the estimated weekly payment is approximately $15,535. The spread is $135,000. At $15,535 per week, the Purchased Amount is repaid in approximately 28 weeks—roughly 196 days. The implied annualized rate is ($135,000 ÷ $300,000) ÷ (196 ÷ 365) = 83.8%.

146. Under Florida Statute § 687.071(2), any person who willfully and knowingly charges interest on a loan at a rate exceeding 25% per annum commits a felony. The civil consequence is forfeiture of the entire principal. *Pinchuck*, 920 So. 2d at 717. Fox's implied rate of 63.9% exceeds the 25% criminal usury threshold by a factor of more than two and a half. SQ Advance's implied rate of 83.8% exceeds it by a factor of more than three.

147. Fox's usury savings clause (Fox Agreement, § 1.9.4) and contractual waiver of the usury defense (Fox Agreement, § 1.9.6) do not rescue a criminally usurious transaction. Contractual waivers of the criminal usury defense are void as against public policy. *Singh v. The LCF Grp.*, 2023 NY Slip Op 33014(U) (Sup. Ct. 2023); N.Y. Gen. Oblig. Law § 5-521. A usury savings clause cannot retroactively cure a transaction that was usurious at inception. *Blue Wolf*, 105 A.D.3d at 183.

148. The Fox Agreement and the SQ Agreement, once recharacterized as loans, are void as criminally usurious under Florida Statute § 687.071. Neither Fox nor SQ Advance holds any enforceable claim against the Debtors or any ownership or security interest in the Stripe Receivables.

149. The threshold recharacterization inquiry is governed by the Third Circuit's *SubMicron* framework—federal common law that applies in every adversary proceeding in this Court regardless of the contractual choice-of-law provision. *SubMicron*, 432 F.3d at 457. Once the Court determines the transaction is a loan, the consequences—including whether it is usurious— are governed by the substantive law specified in each agreement's choice-of-law provision: Florida for Fox and SQ Advance; New York for SBF/Partners. The ultimate remedies—including claim disallowance—are governed by federal bankruptcy law.

150. Under 11 U.S.C. § 502(b)(1), a claim is disallowed to the extent it is "unenforceable against the debtor and property of the debtor, under any agreement or applicable law." Because the Fox, SQ Advance, and SBF/Partners agreements are void as criminally usurious loans under the applicable state law identified above, the claims arising from those agreements are unenforceable and must be disallowed.

## COUNT II

### (Turnover of Estate Property Under 11 U.S.C. § 542 — Against Stripe, Inc.)

151. Plaintiffs repeat, reallege, and incorporate by reference herein the allegations contained in paragraphs 1 through 150 of the Complaint as though fully set forth in this Count II.

152. This is a claim for turnover of estate property under 11 U.S.C. § 542(a).

153.    Section 542(a) provides that an entity, other than a custodian, in possession, custody, or control, during the case, of property that the debtor may use, sell, or lease under § 363, must deliver such property to the debtor unless it is of inconsequential value or benefit to the estate. *In re Denby-Peterson*, 941 F.3d 115, 121 (3d Cir. 2019).

154.    As of the Petition Date, approximately $692,537 in prepetition revenues generated by the Debtors' restaurant operations through DoorDash and GrubHub delivery orders was held by Stripe, Inc. in accounts maintained on the Debtors' behalf, consisting of $639,365 in DoorDash activity and $53,172 in GrubHub activity from October 2, 2025 through May 15, 2026. These funds are proceeds of the Debtors' accounts receivable—credit card transactions processed before the Petition Date—and constitute property of the estate under 11 U.S.C. § 541(a)(1).

155.    Since the Petition Date, the Debtors' restaurants have continued to generate DoorDash and GrubHub delivery revenues processed through Stripe. These postpetition receivables constitute property of the estate under 11 U.S.C. § 541(a)(7). No prepetition creditor can claim ownership of postpetition receivables under § 552(a), which terminates any further transfer of after-acquired property to prepetition creditors upon the filing of the bankruptcy case.

156.    Stripe is an entity other than a custodian. Stripe is in possession, custody, and control of both the prepetition frozen balance and all postpetition receivables accumulated since May 15, 2026. Stripe holds these funds in accounts associated with the Debtors' restaurant operations, as reflected in the DoorDash Liens Report.

157.    The Debtors may use the Stripe Receivables under § 363. The Stripe Receivables are necessary to pay rent, payroll, food suppliers, and other operating expenses required to maintain the Debtors' eleven restaurant locations and preserve going-concern value during these

Chapter 11 Cases. Without turnover of the Stripe Receivables, the Debtors cannot meet payroll and rent obligations due June 1, 2026.

158. The Stripe Receivables are not of inconsequential value or benefit to the estate. The combined prepetition and postpetition Stripe Receivables total approximately $729,726, representing a material portion of the Debtors' available liquidity. The Stripe Receivables are essential to the Debtors' ability to operate and reorganize.

159. Stripe does not claim any ownership interest in the Stripe Receivables. Stripe is a payment processor that holds the Debtors' revenues in custodial accounts pending disbursement. Stripe's sole basis for withholding the Stripe Receivables is the existence of prepetition lien notices sent to it by Fox Funding, SQ Advance, Partner Funding, and Libertas. Stripe asserts no right of setoff under § 553 and owes no debt to any lien-notice party that would excuse turnover.

160. To the extent Stripe contends that the lien notices delivered to it by the Defendants create a legitimate dispute over ownership, those claims fail for the reasons set forth in Counts I, IV, and V of this Complaint: the Non-Consenting MCA Parties' agreements are either void as usurious (Count I), their security interests are unperfected and avoidable (Count IV), and in all events their interests are subordinate to Libertas's prior perfected blanket security interest, which Libertas has agreed to permit the Debtors to use as cash collateral (Count V). Libertas—the only party with a colorable senior claim to the Stripe Receivables—does not oppose turnover.

161. Stripe is obligated under § 542(a) to deliver to the Debtors all prepetition funds frozen as of the Petition Date and all postpetition revenues accumulated since May 15, 2026, and to account for such property. The Debtors further seek prospective relief directing Stripe to resume normal disbursement of postpetition receivables to the Debtors' DIP account on a going-forward

basis, so that the estate is not required to file serial applications to recover newly accumulated funds each week.

## COUNT III

**(Violation of the Automatic Stay Under 11 U.S.C. § 362(a) — Against Fox Funding Group LLC, SQ Advance LLC, and Partner Funding MD LLC)**

162.    Plaintiffs repeat, reallege, and incorporate by reference herein the allegations contained in paragraphs 1 through 161 of the Complaint as though fully set forth in this Count III.

163.    This is a claim for declaratory and injunctive relief arising from violations of the automatic stay under 11 U.S.C. § 362(a)(3) and § 362(a)(6).

164.    On May 15, 2026, the Debtors filed voluntary petitions for relief under Chapter 11 of the Bankruptcy Code. The filing triggered the automatic stay under § 362(a), which prohibits, among other things, "any act to obtain possession of property of the estate or of property from the estate or to exercise control over property of the estate." 11 U.S.C. § 362(a)(3). The automatic stay also prohibits "any act to collect, assess, or recover a claim against the debtor that arose before the commencement of the case." 11 U.S.C. § 362(a)(6).

165.    The Debtors seek a declaratory judgment that the Defendants' continued holding of their cash violates the automatic stay under § 362(a)(3) and § 362(a)(6), and an order directing the Defendants to withdraw their lien notices with Stripe.

## COUNT IV

### (Avoidance of Unperfected Security Interests Under 11 U.S.C. § 544(a)(1) — Against Partner Funding MD LLC and SQ Advance LLC)

166.     Plaintiffs repeat, reallege, and incorporate by reference herein the allegations contained in paragraphs 1 through 165 of the Complaint as though fully set forth in this Count IV.

167.     Under § 544(a)(1), the debtor-in-possession has, as of the commencement of the case and without regard to any knowledge of the debtor or any creditor, the rights and powers of a creditor that extends credit to the debtor at the time of the commencement of the case and obtains a judicial lien on all property on which a creditor on a simple contract could have obtained such a judicial lien, whether or not such a creditor exists. 11 U.S.C. § 544(a)(1); 11 U.S.C. § 1107(a).

168.     Under Delaware's Uniform Commercial Code, a financing statement must be filed to perfect a security interest in personal property. 6 Del. C. § 9-310(a). An unperfected security interest is subordinate to the rights of a person who becomes a lien creditor before the security interest is perfected. 6 Del. C. § 9-317(a)(2). Because the debtor-in-possession has the status of a hypothetical judicial lien creditor as of the Petition Date, any security interest that was not perfected by filing before May 15, 2026, is avoidable.

169.     The Debtors are Delaware limited liability companies. Under 6 Del. C. § 9-301(1), the law of the jurisdiction where the debtor is located governs perfection and the effect of perfection or nonperfection of a security interest. Delaware is the proper jurisdiction for the filing of UCC financing statements against each Debtor entity.

170.     As set forth above, the SBF/Partners Agreement grants SBF/Partners a blanket security interest in all present and after-acquired tangible and intangible personal property of the Borrower and Guarantor, including cash, inventory, equipment, investment property, instruments, chattel paper, intellectual property, letter-of-credit rights, accounts, deposit accounts, commercial

tort claims, general intangibles, and all proceeds. SBF/Partners Agreement, § "Security Interest." The SBF/Partners Agreement authorizes SBF/Partners to file UCC financing statements to perfect that interest. SBF/Partners Agreement, § "Protecting the Security Interest."

171.     SBF/Partners never filed a UCC financing statement. The Debtors have conducted UCC searches in both Delaware and Texas—the two jurisdictions in which UCC financing statements have been filed against Lena entities. No UCC financing statement filed by or on behalf of Partner Funding MD LLC, Smart Business Funder, or any entity identifiable as SBF/Partners has been identified against any Lena entity in either jurisdiction. SBF/Partners' security interest is unperfected.

172.     Because SBF/Partners' security interest was unperfected as of the Petition Date, it is subordinate to the rights of the Debtors as hypothetical judicial lien creditors under § 544(a)(1) and 6 Del. C. § 9-317(a)(2). The Debtors are entitled to avoid SBF/Partners' security interest in its entirety. Although SBF/Partners has withdrawn its lien notice postpetition (as set forth in Section IV.D above), this count is pleaded in the alternative to the extent SBF/Partners' withdrawal is not deemed a full release of its asserted interest in the Stripe Receivables or to the extent SBF/Partners asserts any residual claim to the receivables.

173.     As set forth above, the SQ Agreement grants SQ Advance a security interest in all of the Debtors' accounts and proceeds as defined under UCC Article 9. SQ Agreement, § 4.1.

174.     Upon information and belief, SQ Advance has no independently perfected UCC financing statement filed in Delaware against any Lena entity. The Debtors have conducted UCC searches in both Delaware and Texas. No UCC financing statement naming SQ Advance as secured party has been identified in either jurisdiction.

44

175.    A Texas filing dated June 25, 2025 (No. 25-0033184389, filed by CT Corporation System as agent) is date-compatible with the SQ Agreement (executed June 24, 2025). That same filing is also date-compatible with the Cromwell Agreement (executed June 16, 2025) and the Cedar Agreement (executed on or about June 12, 2025). The Debtors requested confirmation from SQ Advance, Cromwell, and Cedar prepetition, but each declined to identify itself as the secured party behind the CT Corporation filing.

176.    SQ Advance bears the burden of proving the validity and perfection of its security interest. To the extent SQ Advance cannot demonstrate that a UCC financing statement was filed on its behalf before the Petition Date, its security interest is unperfected and subordinate to the Debtors' rights as hypothetical judicial lien creditors under § 544(a)(1).

177.    The Debtors intend to seek discovery from CT Corporation System under Federal Rule of Bankruptcy Procedure 2004 or Federal Rule of Civil Procedure 30(b)(6) (made applicable by Federal Rule of Bankruptcy Procedure 7030) to confirm the identity of the underlying secured party behind the June 25, 2025, filing. The Debtors reserve the right to amend this count upon confirmation.

178.    Upon avoidance of Partner Funding's and SQ Advance's security interests, each is reduced to the status of an unsecured creditor. The lien notices delivered to Stripe by Partner Funding (through Topline Recovery) and SQ Advance (through David Fogel PC) with Stripe have no legal basis, and neither defendant has any secured claim to the Stripe Receivables.

**COUNT V**

**(Declaratory Judgment — Determination of Lien Priority Under UCC Article 9 — Against Fox Funding Group LLC, SQ Advance, Libertas Funding LLC, and Partner Funding MD LLC)**

179.    Plaintiffs repeat, reallege, and incorporate by reference herein the allegations contained in paragraphs 1 through 178 of the Complaint as though fully set forth in this Count V.

180.    This is a claim for declaratory relief brought under 28 U.S.C. §§ 2201 and 2202 to determine the validity, extent, and priority of the defendants' asserted interests in the Debtors' accounts and receivables.

181.    In the alternative to Count I, and without waiving any argument that the Non-Consenting MCA Parties' agreements are void as usurious loans, the Debtors seek a declaration that even if the Fox, SQ Advance, and SBF/Partners agreements are treated as true sales of receivables, the interests created by those agreements are junior and subordinate to Libertas's prior perfected blanket security interest under UCC § 9-322(a)(1), leaving the Non-Consenting MCA Parties with no superior right to the Stripe Receivables.

182.    Libertas holds a blanket security interest in all of the Debtors' accounts, payment intangibles, and rights to payment—perfected by UCC filings in September 2024—that is senior to any interest subsequently acquired by the Non-Consenting MCA Parties. The following paragraphs set forth the basis for this priority determination.

183.    On September 18, 2024, CT Corporation System filed two UCC financing statements in Delaware on behalf of Libertas: DE No. 20246444465 and DE No. 20246450868. As set forth above, these filings cover all "Accounts, Payment Intangibles, Letter of Credit Rights, in each case, as defined in Article 9 of the Uniform Commercial Code, and rights to payment of any kind, including chose in action, whether any of the foregoing is owned now or acquired later;

46

all records of any kind relating to any of the foregoing; and all proceeds relating to any of the foregoing." These are the earliest UCC filings of record against any Lena entity.

184.    Libertas's blanket security interest is not limited to any percentage of receivables—it covers all accounts, payment intangibles, and rights to payment of any kind. Under UCC § 9-322(a)(1), Libertas has first priority over every subsequently filed interest in the same collateral. The earliest Non-Consenting MCA Party filing of record is Fox Funding's UCC-1 (DE No. 20253681035), filed May 22, 2025—eight months after Libertas's initial filing. SBF/Partners never filed at all.

185.    The Non-Consenting MCA Parties may argue that Libertas "only purchased 7.75%" of receivables, leaving the remainder available for subsequent purchasers. That argument fails because Libertas holds two distinct interests: (a) a purchase interest in 7.75% of Future Receipts until the Completion Amount of $2,192,520 is delivered (Libertas Agreement, § 1.3); and (b) a blanket security interest in all accounts, payment intangibles, rights to payment, and proceeds—perfected by the September 18, 2024 UCC filings and not limited to any percentage (Libertas Agreement, § 4.1; DE Nos. 20246444465 and 20246450868). The Non-Consenting MCA Parties' "purchases" are subordinate to Libertas's blanket security interest—not merely to its 7.75% purchase interest. Under Article 9, competing interests in the same accounts are prioritized by filing date regardless of whether they arise from a "sale" or a "security agreement." Libertas's security interest covers all accounts; its filing date of September 2024 defeats any subsequent filing.

186.    At the time each Non-Consenting MCA agreement was executed (May–September 2025), the Debtors' receivables were already subject to Libertas's prior perfected blanket security interest, filed eight to twelve months earlier. Under UCC § 9-318(b), a sale of accounts does not

47

impair the rights of a prior perfected secured party. A buyer of accounts takes subject to prior perfected Article 9 interests. The Non-Consenting MCA Parties' "ownership" interest—even if valid—is subordinate to Libertas's first-priority lien on the same receivables they purport to have "purchased." The Debtors could not convey what they did not have.

187.   The Non-Consenting MCA Parties were on constructive notice of Libertas's prior interest. The September 2024 UCC filings are a matter of public record. A prudent buyer of receivables would have searched the UCC filings, discovered Libertas's prior filing, and understood that any "purchase" of the Debtors' receivables would be subordinate to Libertas. Moreover, the Libertas Agreement expressly prohibited the Debtors from selling Future Receipts or obtaining additional financing without Libertas's written consent. Libertas Agreement, § 2.15. The Non-Consenting MCA agreements were entered in apparent violation of that covenant.

188.   As set forth in Section IV.E above, the aggregate Specified Percentages of the eleven MCA agreements for which data is available total 135.53% of the Debtors' daily receivables—before adding SBF/Partners, whose blanket security interest covers the same collateral pool. Multiple parties cannot simultaneously "own" overlapping portions of the same revenue stream. Under Article 9, the first-to-file rule resolves this conflict—and Libertas filed first.

189.   Even assuming the Non-Consenting MCA Parties' agreements constitute true sales of receivables, those parties cannot have acquired ownership free and clear of Libertas's prior perfected blanket lien. Under UCC § 9-318(b), a sale of accounts does not impair the rights of a prior perfected secured party. A buyer of encumbered accounts takes subject to that lien unless the secured party releases it. Libertas did not consent to any subsequent sale and did not release its lien. The Non-Consenting MCA Parties' purported ownership interests—to the extent they exist—

48

are therefore subordinate to Libertas's first-priority security interest. Libertas—the only party with a senior claim to the Stripe Receivables—does not oppose turnover.

190. The Court need not resolve the recharacterization question to grant the relief sought in this Count. Under any characterization—loan, true sale, or unperfected security interest—the Non-Consenting MCA Parties hold no interest in the Stripe Receivables that is superior to (or even equal with) Libertas's prior perfected interest. Under Article 9's first-to-file rule, Libertas's September 2024 filings defeat any subsequent interest in the same collateral. Libertas has consented to the return of the Stripe Receivables to the estate as cash collateral subject to adequate protection. The Non-Consenting MCA Parties' lien notices with Stripe have no legal basis superior to Libertas's first-priority interest, and those notices should be declared ineffective as against the estate. SBF/Partners' postpetition withdrawal of its lien notice—notwithstanding its express loan agreement and blanket security interest—confirms that no Non-Consenting MCA Party holds a superior claim to Libertas's first-priority interest.

## VI.

## RESERVATION OF RIGHTS

191. The Debtors expressly reserve all claims, causes of action, and defenses against any MCA party not named as a defendant in this adversary proceeding, including but not limited to Thoro Corp, Immediate Capital Solutions LLC, G&G Funding Group LLC, Cromwell Capital LLC, Riverside Capital NY, Cedar Advance LLC, and Green Note Capital Partners SPV LLC. Reserved claims include, without limitation: (a) recharacterization of purported sales of future receivables as loans; (b) avoidance of preferential transfers under 11 U.S.C. § 547; (c) equitable subordination under 11 U.S.C. § 510(c); (d) disallowance of claims under 11 U.S.C. § 502(b)(1);

49

and (e) avoidance of fraudulent transfers under 11 U.S.C. § 548. Nothing in this Complaint shall be construed as a waiver, release, or limitation of any such claims or defenses.

## VII.

### PRAYER FOR RELIEF

WHEREFORE, Plaintiffs Lena Holdings LLC, Lena Brands LLC, and Lena Real Estate Holdings LLC, as debtors and debtors-in-possession, respectfully request that this Court enter judgment in their favor and against the Defendants as follows:

192. As to Count I (Declaratory Judgment — Recharacterization and Usury): A declaratory judgment that (a) the SBF/Partners Agreement is a criminally usurious loan, void under New York Penal Law § 190.40 and N.Y. Gen. Oblig. Law § 5-511, without any need for recharacterization; (b) the Fox and SQ Advance agreements are disguised loans, not true sales of receivables, and upon recharacterization are likewise void as criminally usurious under Florida Statutes § 687.071; and (c) none of the Non-Consenting MCA Parties holds any enforceable claim against the Debtors or any ownership interest in the Stripe Receivables.

193. As to Count II (Turnover Under 11 U.S.C. § 542): An order compelling Stripe, Inc. to turn over to the Debtors all prepetition funds (approximately $692,537) and all postpetition receivables accumulated since May 15, 2026, and to account for such property.

194. As to Count II (Prospective Relief): Prospective injunctive relief directing Stripe, Inc. to resume normal disbursement of postpetition receivables to the Debtors' DIP account on a going-forward basis, without the need for serial applications to this Court.

195. As to Count III (Automatic Stay Violation Under 11 U.S.C. § 362): A declaratory judgment that Fox Funding's and SQ Advance's maintenance of the lien notices with Stripe violates the automatic stay under 11 U.S.C. § 362(a)(3) and § 362(a)(6), and an order directing Fox Funding and SQ Advance to withdraw their lien notices forthwith. As to SBF/Partners, this

relief is noted as potentially moot in light of SBF/Partners' postpetition withdrawal of its lien notice, but the claim is preserved in the alternative.

196.    As to Count IV (Avoidance Under 11 U.S.C. § 544): An order avoiding SBF/Partners' unperfected security interest under 11 U.S.C. § 544(a)(1) and preserving such avoided interest for the benefit of the estate under 11 U.S.C. § 551, to the extent SBF/Partners' postpetition withdrawal of its lien notice is not deemed a full release of its asserted interest in the Stripe Receivables.

197.    As to Count V (Determination of Lien Priority Under UCC Article 9): A declaratory judgment that Libertas's blanket security interest, perfected by UCC filings in September 2024, has first priority over any interest held by Fox Funding, SQ Advance, or SBF/Partners in the Debtors' accounts and receivables under UCC § 9-322(a)(1); that even if the Non-Consenting MCA Parties' agreements are treated as true sales of receivables, the interests created by those agreements are junior and subordinate to Libertas's prior perfected blanket lien under UCC § 9-318(b); and that the Non-Consenting MCA Parties' lien notices with Stripe are ineffective as against the estate.

198.    Disallowance or reduction of Fox Funding's, SQ Advance's, and SBF/Partners' claimed balances to the extent they include unenforceable penalty charges, default fees, excessive attorneys' fees, or other amounts not recoverable under applicable law.

199.    An award of actual damages, including any costs incurred by the Debtors as a result of the Defendants' willful violation of the automatic stay, pursuant to 11 U.S.C. § 362(k).

200.    Attorneys' fees and costs of this adversary proceeding to the extent permitted by applicable law or agreement.

201.    Such other and further relief as this Court deems just and proper.

51

Dated: May 28, 2026                    **PIERSON FERDINAND LLP**

*/s/ Mette H. Kurth*
Mette H. Kurth (DE Bar No. 6491)
Jeffrey M. Carbino (DE Bar No. 4062)
3411 Silverside Road
Baynard Building, Suite 104-13
Wilmington, DE 19810
Email: mette.kurth@pierferd.com
Email: jeffrey.carbino@pierferd.com
Telephone: (302) 907-9262
Telephone: (302) 485-0604

Lynnette R. Warman (TSB 208674940)
*(Pro Hac Vice)*
PIERSON FERDINAND LLP
1341 W. Mockingbird Lane, Suite 600W
Dallas TX 75247
Email: lynnette.warman@pierferd.com
Telephone: (214) 872-6319

Marc A. Lindemann (NY Attorney Reg. No. 4024063)
*(Pro Hac Vice)*
PIERSON FERDINAND LLP
1270 Avenue of the Americas, 7th Floor - 1050
New York, NY 10020
Email: marc.lindemann@pierferd.com
Telephone: (646) 347-7952

*Proposed Counsel for Debtors and Debtors in Possession*

52